UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL J. TOMASINI,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>JAMES CHAU, et al.,<br><br>　　　　Defendants. | No.  2:18-cv-00286 DAD AC<br><br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff is a state prisoner proceeding pro se with this civil rights action filed pursuant to 42 U.S.C. § 1983.  This case is proceeding on plaintiff's second amended complaint against defendants Chau, Jackson, Smith, and Ashby for Eighth Amendment claims of deliberate indifference to plaintiff's serious medical needs between 2015 and 2017.  ECF No. 16 (screening order).  Defendants have filed a motion for summary judgment.  ECF No. 74.  Plaintiff has filed an opposition, ECF No. 76, and defendants have filed a reply.  ECF No. 77.  For the reasons that follow, the undersigned recommends that the motion for summary judgment be granted.

/////
/////
/////
/////
/////

1

I. <u>Allegations in the Unverified Second Amended Complaint</u>[1]

While plaintiff was a prisoner at Mule Creek State Prison ("MCSP") he was seen by defendant Dr. Chau several times in November and December 2015 for complaints of an "almost non-existent flow of urine" and increased pain in his abdomen, groin, and lower back. ECF No. 15 at 19. Plaintiff alleges that defendant Dr. Chau diagnosed him with Benign Prostatic Hypertrophy ("BPH") on February 12, 2016 without conducting a digital rectal examination and refused to refer plaintiff to a urologist for his ongoing symptoms. ECF No. 15 at 4.

By May 5, 2016, plaintiff's urinary symptoms and associated pain were getting worse, and he was seen by defendant Dr. Smith. ECF No. 15 at 5, 31. Dr. Smith failed to perform a rectal examination, order a urinary catheter, or refer plaintiff to a urologist even though plaintiff informed him that he had a family history of prostate cancer. <u>Id.</u>

On December 27, 2016, plaintiff was seen by Dr. Chau again for his ongoing inability to empty his bladder completely, his constant urge to urinate, as well as associated pain in doing so. <u>Id.</u> at 7. Dr. Chau noted that plaintiff's prostate was uniformly enlarged after a digital rectal exam, but he did not refer plaintiff to a urologist. <u>Id.</u>

In follow-up appointments on April 11, 2017 with Dr. Jackson[2] and May 23, 2017 with Dr. Ashby, plaintiff requested another digital rectal exam and urinary catheter which was denied. <u>Id.</u> at 9-10; 27. Instead, the doctors ordered a urology consult for plaintiff. <u>Id.</u>

On August 28, 2017, following several urology consultations outside MCSP, plaintiff was diagnosed with an "aggressive, high-volume, high-grade Gleason Grade 9 adenocarcinoma," hereinafter referred to as prostate cancer. ECF No. 15 at 12. Plaintiff alleges that the delay in his

---

[1] This unverified complaint cannot be considered as evidence in opposition to summary judgment. <u>Moran v. Selig</u>, 447 F.3d 748, 759 & n. 16 (9th Cir. 2006) (stating that an unverified complaint cannot be considered as evidence on motion for summary judgment). On March 7, 2024, the court provided plaintiff the opportunity to submit a declaration signed under penalty of perjury attesting to the contents of his second amended complaint. ECF No. 78. Plaintiff did not respond to the court order and the time to do so has expired.

[2] Plaintiff makes clear that defendant Jackson "is not a defendant to this action because he denied plaintiff's medical appeal [in January 2017], Dr. Jackson is a defendant… for treatment that he provided to plaintiff later on." ECF No. 15 at 7. Therefore, the court does not include any facts related to Dr. Jackson's review of plaintiff's medical grievance.

2

1  diagnosis and treatment by defendants caused him permanent damage to his bladder and kidneys
2  as well as the proliferation of his prostate cancer which is ultimately terminal.  Id. at 12.
3        II.     Motion for Summary Judgment
4        Defendants seek summary judgment on the grounds that: (1) there is no genuine issue of
5  material dispute on the merits of the Eighth Amendment deliberate indifference claims; (2)
6  plaintiff failed to exhaust his administrative remedies with respect to his claims against
7  defendants Jackson, Ashby, the medical care provided by defendant Smith on May 26, 2015, and
8  the medical care provided by defendant Chau prior to August 2016; and (3) defendants are
9  entitled to qualified immunity.  ECF No. 74.
10       By way of opposition, plaintiff emphasizes defendants failed to do "two simple things
11 consistent with established medical practice."  ECF No. 76 at 1.[3]  The first was to ask if plaintiff's
12 father ever had prostate cancer, and the second was to perform a digital rectal exam.  ECF No. 76
13 at 1.  Plaintiff waited two years before a urologist finally did both resulting in his diagnosis of "an
14 aggressive, gleason-9 prostate cancer."  Id.
15       In their reply, defendants point out that plaintiff's opposition was not signed under penalty
16 of perjury.  ECF No. 77 at 2.  Moreover, plaintiff has not complied with the Federal Rules of
17 Civil Procedure or the Local Rules by providing any admissible evidence to establish a genuine
18 factual dispute warranting a trial.  ECF No. 77 at 2-3.  In light of the lack of any factual support
19 for plaintiff's claims, defendants are entitled to summary judgment.  ECF No. 77 at 3.
20       On March 7, 2024, the court provided plaintiff with the opportunity to verify the contents
21 of his second amended complaint in opposition to the pending summary judgment motion.  ECF
22 No. 78.  Plaintiff has not responded to the court's order and the deadline to do so has now passed.
23       III.    Summary Judgment Standard Under Rule 56
24       Summary judgment is appropriate when the moving party "shows that there is no genuine
25 dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

---

[3] Like his second amended complaint, plaintiff's opposition is not signed under penalty of perjury or otherwise verified so it cannot be used as evidence in opposition to summary judgment. See supra at n. 1.

Civ. P. 56(a). Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. In such a circumstance, summary judgment should "be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is

genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls v. Cent. Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank, 391 U.S. at 289).

IV.    Undisputed Material Facts[4]

Defendant Dr. Chau was employed by the California Department of Corrections and Rehabilitation ("CDCR") as a Physician and Surgeon and was assigned to be plaintiff's primary care physician from mid-2015 until March 2017. Defendants' Statement of Undisputed Facts

---

[4] As plaintiff's opposition to summary judgment does not cite to particular record materials or show how any such materials establish the presence of a genuine dispute of fact, the court will deem the facts in the record as undisputed for purposes of the motion. See Hazeltine v. Montoya, 2012 WL 761242, at *2 (E.D. Cal. Mar.7, 2012) (deeming facts in the record undisputed pursuant to Rule 56(e)).

5

("DSUF") at No. 4-5. Defendants Jackson and Ashby were employed as Physicians and Surgeons at all times relevant to the allegations in the amended complaint. DSUF at Nos. 6-7. Defendant Smith was employed as the Chief Physician and Surgeon at MCSP. DSUF at No. 8.

During medical visits on August 12, 2015 and October 1, 2015, plaintiff did not discuss any urinary issues or problems with defendant Chau. ECF No. 74-6 at 3 (Chau Declaration). Plaintiff did not submit any health care service request forms in 2015 for "any urinary difficulties or concerns, and specifically issued no complaints of painful urine retention, bloating, lower rear back pain or groin pain…." ECF No. 74-3 at 3 (Feinberg Declaration). Nor did he go to the TTA to receive urgent treatment for any urinary problem. DSUF at No. 97.

During a routine check up on December 4, 2015, defendant Chau prescribed Flomax to treat plaintiff's Benign Prostatic Hyperplasia ("BPH") which is "an age-associated prostate gland enlargement which can cause issues with urination." DSUF at Nos. 14, 16, 17. BPH is not considered to be a precursor or indicator of prostate cancer. DSUF at No. 18. Dr. Chau also ordered additional lab tests including a urinalysis and a Prostate-Specific Antigen or "PSA" test. DSUF at No. 16. These lab tests were conducted on February 3, 2016 and revealed that plaintiff's PSA was within normal limits at 1.2 and his urinalysis was not remarkable.[5] DSUF at No. 19; ECF No. 74-3 at 59 (Quest Diagnostics Final Report). Based on defendant Chau's review of plaintiff's prior PSA testing, this result was largely unchanged and was not indicative of prostate cancer. DSUF at No. 20.

Between this visit with defendant Chau and plaintiff's next primary care check up on February 12, 2016, plaintiff did not seek any urgent medical care appointments pertaining to urinary problems. DSUF at Nos. 21-22.

During the February 12, 2016 medical visit with defendant Chau, plaintiff indicated that he may be allergic to the Flomax, so other alternatives were discussed including a different prescription medication. DSUF at No. 23. Plaintiff specifically requested an herbal remedy which defendant Chau told him was not offered by CDCR. DSUF at No. 23. Defendant Chau

---

[5] His prior PSA test from July 2015 was at 1.1. ECF No 74-3 at 48 (Quest Diagnostics Lab Report).

6

also suggested that plaintiff could stop taking the Flomax to see if his allergy resolved before his next primary care visit. DSUF at No. 23. At that point no change in treatment was ordered and plaintiff indicated that he would let Dr. Chau know whether he wanted to change medication. Id.

Plaintiff's next medical visit with defendant Chau occurred on March 9th or 10th, 2016 during a primary care check up. Compare ECF No. 74-3 at 67 (PCP Progress Note dated 3/10/16) with ECF No. 74-3 at 68 (Medical Progress Note dated 3/9/16). Although other medical issues were addressed, with respect to plaintiff's BPH, defendant Chau indicated that it was stable and that he should continue taking Flomax. DSUF at No. 24. According to Dr. Chau, plaintiff did not appear to be in physical distress or pain with respect to any urinary issues. ECF No. 74-6 at 4. Dr. Chau also informed plaintiff that his laboratory results from February were normal and that his PSA level was 1.2. DSUF at No. 24; ECF No. 74-3 at 68.

Plaintiff submitted a health care services request form for a colonoscopy on March 18, 2016. ECF No. 74-3 at 71. On April 5, 2016, defendant Chau saw plaintiff in the medical clinic and submitted a Request for Services Form ("RFS") for plaintiff to receive a colonoscopy.[6] DSUF at No. 25. Plaintiff's BPH was not discussed and there were no indications that the Flomax was not working or that plaintiff had stopped taking it. DSUF at No. 25.

Defendant Smith saw plaintiff for a chronic care medical visit on May 25, 2016 because Dr. Chau was absent.[7] DSUF at No. 27. Dr. Smith discussed several of plaintiff's medical conditions with him, including his BPH. ECF No. ECF No. 74-4 at 3 (Smith Declaration). Plaintiff informed Dr. Smith that he had stopped taking the Flomax because he was experiencing blurry vision. DSUF at No. 27. He did not report experiencing any acute urinary problems and Dr. Smith's assessment determined that plaintiff's BPH was at goal. DSUF at No. 28. Dr. Smith did not see anything during his physical evaluation or his review of plaintiff's medical records that indicated the need for any further referral or diagnostic testing. DSUF at No. 28.

---

[6] A RFS is submitted to medical supervisors for review and are either granted or denied. DSUF at No. 26.
[7] As the Chief Physician and Surgeon, Dr. Smith did not regularly provide direct patient care. DSUF at No. 29.

On July 12, 2016, plaintiff was seen by defendant Chau for complaints of back pain after he submitted a 7362 form. DSUF at No. 36. In order to evaluate plaintiff's back pain, Dr. Chau asked if plaintiff had experienced a loss of bowel or bladder control. DSUF at No. 37. Plaintiff indicated that he did not. DSUF at No. 37.

Plaintiff submitted another 7362 form for lower back pain on July 24, 2016. DSUF at No. 39. The Health Care Services Request form that plaintiff completed did not list any problems with urinating. DSUF at No. 39. Dr. Chau saw plaintiff for this medical problem as well as other issues not related to BPH on August 3, 2016. DSUF at No. 40. When discussing his low back pain, plaintiff once again denied any loss of bowel or bladder control. DSUF at No. 40.

On the same day as his visit with defendant Chau, plaintiff submitted his first Health Care Service Request Form for issues related to urination. DSUF at Nos. 42, 43, 99; ECF No. 74-3 at 91. Plaintiff indicated that he was "having increasing difficulty starting a stream of urine despite frequent, sudden urges to void." DSUF at No. 42. Based on this medical request, plaintiff was seen by a nurse the next day, on August 4, 2016. DSUF at No. 44. The nurse consulted with defendant Chau who believed that plaintiff's symptoms could be a urinary tract infection ("UTI") based on his BPH. DSUF at No. 45. Dr. Chau immediately prescribed plaintiff medication to treat a UTI and ordered a urinalysis to be done. DSUF at No. 46.

Defendant Chau saw plaintiff on August 8, 2016 for a follow-up visit for lower back pain. DSUF at No. 47. There is no indication in the records of this visit that plaintiff complained of any urinary symptoms or requested a DRE or a urology consult during this appointment. ECF No. 74-3 at 10 (Feinberg Declaration).

Plaintiff did not submit any medical requests for urinary problems before his next visit with Dr. Chau on August 22, 2016. DSUF at Nos. 48-49. Defendant Chau reviewed plaintiff's TTA records from August 10, 2016 which indicated "bladder/bowel ok." DSUF at Nos. 49-51. Plaintiff also informed Dr. Chau that he was not having any "abnormal bowel movements." ECF No. 74-6 at 7; ECF No. 74-3 at 105.

Dr. Chau also treated plaintiff for back pain and mobility issues on August 29, 2016. ECF No. 74-6 at 7. Between this date and October 28, 2016, plaintiff did not submit any medical

8

requests for urinary issues or treatment. DSUF at No. 52. Plaintiff's next visit with Dr. Chau on October 28, 2016 concerned multiple other medical issues not related to his BPH. DSUF at No. 53.

Defendant Chau was notified by a nurse on November 28, 2016 that plaintiff reported difficulty urinating on a 7362 Form that was submitted on November 23, 2016. DSUF at No. 56; ECF No. 74-3 at 115 (Health Care Services Request Form). Dr. Chau prescribed plaintiff with Terazosin which is a medication designed to treat the symptoms of BPH. DSUF at Nos. 56-57.

On December 12, 2016, plaintiff submitted a health care grievance for "increasing BPH and severe restriction to [his] urine flow and denial of more treatment." ECF No. 74-7 at 15 (CDCR 602 HC form). Plaintiff requested "immediate treatment" for his "severe and continually increasing BPH" and wrote "emergency appeal" on the health care grievance form. ECF No. 74-7 at 15.

At plaintiff's next regularly scheduled medical appointment on December 27, 2016, he informed Dr. Chau that he was having frequent urges to urinate at least five times a day with a weak urine flow, but no pain. DSUF at No. 59. The medication Terazosin provided "minimal improvement." DSUF at 59. Dr. Chau performed a DRE with plaintiff's permission and verified it twice. DSUF at No. 60. The DRE indicated that plaintiff had normal rectal tone, normal hemorrhoid, no bleeding, no nodule or mass present, but a uniformly enlarged prostate. DSUF at No. 61. Dr. Chau doubled the prescription dosage of Terazosin and requested a follow-up appointment in 4-6 weeks to assess the efficacy of this medication. DSUF at No. 63. Terazosin may take up to six weeks to have the full effect and higher doses of this medication may work even when lower doses did not provide any relief. DSUF at No. 64-65. Defendant Chau did not believe, based on all of the available information, including normal PSA levels and the DRE exam, that it was necessary to refer plaintiff to a urologist. DSUF at No. 62.

Defendant Jackson was assigned to conduct a medical examination of plaintiff regarding his December 2016 medical grievance related to difficulty urinating and a complete inability to urinate at times. DSUF at Nos. 66-67. This medical exam was conducted on January 13, 2017 during which time Dr. Jackson discussed plaintiff's urinary treatment concerns. ECF No. 74-7 at

4. Plaintiff requested a referral to a urologist. ECF No. 74-3 at 123. Defendant Jackson reviewed all of plaintiff's medical records and concluded that the course of treatment provided by Dr. Chau was appropriate and that no referral to a urologist was necessary. DSUF at Nos. 68-69. In Defendant Jackson's two decades of practicing medicine at that point, he had never seen a patient with a normal PSA that ended up having prostate cancer. DSUF at No. 71. Based on plaintiff's report of a complete inability to urinate on occasion, defendant Jackson did submit an RFS for a bladder and kidney ultrasound with a post-void analysis. DSUF at Nos. 72, 74. Dr. Chau approved this RFS for an ultrasound on January 20, 2017. DSUF at No. 75.

Plaintiff's new PSA test results came back on January 25, 2017 indicating a score of 1.3 which was once again within normal limits. DSUF at No. 76.

Plaintiff was seen for a follow-up visit with Dr. Chau on February 8, 2017 where they discussed the lab results and his treatment options for BPH. ECF No. 74-6 at 9; ECF No. 74-3 at 129-130 (Medical Progress Note). Plaintiff indicated that he had some improvement with the prescribed 4 milligram dosage of Terazosin, so Dr. Chau increased the dosage to 6 milligrams with a follow-up appointment in April to reassess the medication. ECF No. 74-6 at 9; ECF No. 74-3 at 129-130.

On March 7, 2017, plaintiff submitted a health care services request form to have his Terazosin medication increased to 10 milligrams a day. ECF No. 74-3 at 131. The next day, Dr. Ashby agreed to increase his dosage to 8 milligrams per day. ECF No. 74-3 at 131-132.

Also on March 7, 2017, the ultrasound defendant Jackson had requested was conducted. DSUF at No. 80. After reviewing the results on March 8, 2017, defendant Jackson requested a follow-up visit with plaintiff within 7 days. DSUF at No. 81; ECF No 74-7 at 5 (Jackson Declaration). Due to unexplained scheduling errors, for which defendant Jackson was not responsible, this appointment did not occur until April 11, 2017. DSUF at Nos. 82-83. Defendant Jackson discussed plaintiff's ultrasound results with him on April 11, 2017 and offered him a prescription for Proscar, another medication designed to treat BPH. DSUF Nos. 84-85. Plaintiff declined the new medication. DSUF at No. 86. At this point, defendant Jackson submitted a RFS for a face-to-face urology consult with plaintiff. DSUF at No. 87. Defendant

1  Smith approved this RFS for a urology consult on April 21, 2017.  DSUF at No. 88.

2  　　　　Defendant Ashby saw plaintiff for the first time for a medical appointment on May 23, 2017.  DSUF at No. 89; ECF No. 74-5 at 11 (RFS).  Based on the ultrasound results, defendant Ashby also submitted a RFS for a urology referral on an urgent basis.[8]  DSUF at Nos. 90-91; ECF No. 74-5 at 3.  This RFS was approved on May 25, 2017 by defendant Smith.  DSUF at No. 92.

　　　　Plaintiff was transported on June 12, 2017 to the Doctors Hospital of Manteca (DHM) for the urology consultation that had been ordered by defendants Jackson and Ashby.  ECF No. 74-3 at 15.  However, due to a scheduling error, the clinic was closed and plaintiff's appointment was rescheduled.  ECF No. 74-3 at 15.

　　　　On June 26, 2017, plaintiff was transported to the Doctors Hospital of Manteca and was seen by urologist Dr. Hsieh.  DSUF at No. 93.  At this first appointment, Dr. Hsieh's impression was that plaintiff had "urinary retention and bilateral hydronephrosis" and an "abnormal digital rectal exam despite a normal prostate-specific antigen."  ECF No. 74-3 at 146.  He recommended that the renal and bladder ultrasound be repeated, the Foley catheter that was inserted be changed within one month, a new PSA level be obtained, and that a prostate biopsy be scheduled at his office.  ECF No. 74-3 at 146.

　　　　On June 29, 2017, defendant Ashby met with plaintiff and submitted orders and RFS forms to implement Dr. Hsieh's recommendations for a biopsy, ultrasound, follow-up labs and visits.  DSUF at No. 94.  Dr. Ashby indicated that the follow-up appointment and biopsy with Dr. Hsieh was urgent which meant within two weeks.  ECF No. 74-3 at 16.  These orders were approved by Dr. Smith on the same day that they were requested.  ECF No. 74-3 at 16.  Dr. Ashby had no further involvement in plaintiff's medical treatment after he left MCSP in July 2017.  ECF No. 74-3 at 5 (Ashby Declaration).

////

////

---

[8] The actual scheduling of this follow-up appointment was not conducted by Dr. Ashby nor was he responsible the arranging appointments with specialists outside CDCR.  ECF No. 74-5 at 4 (Ashby Declaration).

Plaintiff's PSA result on August 9, 2017 was 2.2. ECF No. 74-3 at 154 (Quest Diagnostics Report). Dr. Hsieh performed a biopsy of plaintiff's prostate on August 18, 2017.[9] ECF No. 7-3 at 155-156. Based on the biopsy results, plaintiff was diagnosed with prostate cancer by Dr. Hsieh on August 28, 2017. ECF No. 74-3 at 17.

A non-party expert medical witness, Dr. Feinberg, reviewed plaintiff's medical records and opined that the medical care provided by defendants in this case was medically appropriate under the circumstances. DSUF at No. 95.

V.   Discussion

A. Eighth Amendment Deliberate Indifference Standard

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). This requires plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Id. (some internal quotation marks omitted) (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992)). A plaintiff can establish deliberate indifference "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Id. (citing McGuckin, 974 F.2d at 1060).

A difference of opinion between an inmate and prison medical personnel—or between medical professionals—regarding the appropriate course of treatment does not by itself amount to deliberate indifference to serious medical needs. Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). To establish that a difference of opinion rises to the level of deliberate indifference, plaintiff "must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" Toguchi, 391 F.3d at 1058 (alteration

---

[9] This was the soonest available appointment time with Dr. Hsieh due to his scheduled vacation. See ECF No. 74-3 at 150.

in original) (quoting Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996)).

B. Discussion

The evidence that defendants have presented in support of summary judgment satisfies their initial burden of demonstrating the absence of a genuine issue of material dispute regarding their treatment of plaintiff's urinary condition. As a result, the burden shifts to plaintiff to demonstrate that a genuine issue of material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Since neither plaintiff's amended complaint nor his opposition is verified, he has not submitted any evidence to create a genuine issue of material fact with respect to the deliberate indifference claims against defendants.

Moreover, even if plaintiff had submitted under oath his testimony as to matters within his personal knowledge, no triable issue of fact would appear. The medical records demonstrate indisputably that plaintiff's PSA levels were within normal range during the period of allegedly delayed diagnosis. Given these normal lab results, the failure to conduct additional diagnostic procedures would not rise to the level of deliberate indifference even if plaintiff had complained of urinary difficulties earlier than the medical records reflect. On the record now before the court, no rational jury could find the necessary subjective awareness of an excessive risk to plaintiff's health and safety, let alone deliberate disregard of such risk. Even crediting plaintiff's allegations that he had demanded additional testing including cancer screening, he has identified no more than a difference of opinion with his medical providers regarding the appropriate course of treatment. Nothing in the court's independent review of the record disputes defendants' evidence that plaintiff received standard care for BPH, which was an appropriate diagnosis based on the information known to defendants at the time.

For all these reasons, the undersigned finds that no reasonable juror could conclude that defendants were deliberately indifferent to plaintiff's serious medical needs and therefore violated plaintiff's rights under the Eighth Amendment.[10] There is no evidence demonstrating any

---

[10] In light of this recommendation, the undersigned declines to reach defendants' alternative arguments for summary judgment based on plaintiff's alleged failure to exhaust administrative remedies and the affirmative defense of qualified immunity.

purposeful act or failure to respond to plaintiff's urinary condition by defendants in this case. See Jett v. Penner, 439 F.3d at 1096. Nor is there any difference of opinion among medical providers establishing that defendants' chosen course of treatment was medically unacceptable or made in conscious disregard of an excessive risk to plaintiff's health. See Toguchi, 391 F.3d at 1058. While the undisputed material facts demonstrate several treatment delays, there is no evidence that any of the defendants were responsible for these scheduling difficulties. For all these reasons, defendants' motion for summary judgment should be granted.

## CONCLUSION

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment (ECF No. 74) be granted;

2. Judgment be entered accordingly; and,

3. The Clerk of Court be directed to close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 21, 2024

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

14